UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                     Case No. 18-cr-296-SRN-KMM

        Plaintiff,

v.                                             REPORT AND RECOMMENDATION

1. THOMAS DANIEL STACHOWIAK,

        Defendant.

Thomas Calhoun-Lopez, Assistant United States Attorney, United States Attorney's Office, 300 S. 4th Street, Suite 600, Minneapolis, MN 55415, counsel for the government

Shannon R. Elkins, Assistant Federal Defender, Office of the Federal Defender, 300 S. 4th Street, Suite 107, Minneapolis, MN 55415, counsel for Thomas Stachowiak

The government has charged Thomas Daniel Stachowiak with conspiring to distribute methamphetamine and other related crimes. This matter is before the Court on Mr. Stachowiak's Motion to Suppress Search and Seizure. [ECF No. 51.][1] The Court held a hearing on the motion on January 31, 2019, received several items into evidence, heard testimony from Stearns County Sheriff's Deputy Adam Johnson ("Deputy Johnson"), and granted the parties' requests to submit post-hearing briefing. [Mins. of Hr'g, ECF No. 57.] For the reasons that follow, the Court recommends that the motion to suppress be denied.

---

[1]    In a February 1, 2019 Order, the Court noted that Mr. Stachowiak had withdrawn a motion to suppress statements. [2/1/2019 Order, ECF No. 58.] However, the Court mistakenly identified docket entry number 51 as the withdrawn motion. The withdrawn motion actually appears at docket entry number 52. As noted in the April 2, 2019 Amended Order, this report and recommendation concerns the motion to suppress at docket entry number 51 and does not address the admissibility of any statements Mr. Stachowiak may have made to law enforcement.

## Background

The factual record relevant to Mr. Stachowiak's motion to suppress includes: (1) Minnesota State court orders from March and April 2018 authorizing, among other things, GPS tracking of the phones associated with two cellular phone numbers [Gov't Exs. 1 ("Ex. 1") & 2 ("Ex. 2")]; (2) a September 14, 2018 traffic stop, which involved the search of Mr. Stachowiak's vehicle and ended in his arrest [Gov't Ex. 7 ("Ex. 7")]; and (3) the testimony provided by Deputy Johnson at the January 31, 2019 hearing regarding the September 18th traffic stop and search of Mr. Stachowiak's vehicle.[2] In general, Mr. Stachowiak argues that law enforcement failed to comply with constitutional requirements when they obtained the March 7th and the April 18th tracking orders for two cellular phone numbers. He also argues that the September 14, 2018 traffic stop was unlawful, and contends that any evidence obtained as a result of that stop must be suppressed as fruit of the poisonous tree.

### March 7, 2018 Tracking Order

On March 7, 2018, Saint Paul Police Department Officer Clay Johnson ("Officer Johnson") applied for an Order authorizing the installation and use of a pen register, trap and trace device, and an electronic tracking device (including GPS location and real-time data) on a mobile telephone number ending in 3856. [Ex. 1.] The application also sought stored voice messages, SMS and MMS data, cell site activations, numbers dialed, and other information. [Ex. 1 at 1.] With respect to the tracking device,

---

[2]     Counsel for the government also submitted other exhibits, including: (1) a May 1, 2018 search warrant authorizing the search of a storage unit in Maplewood, Minnesota [Gov't Ex. 3 ("Ex. 3")]; (2) a May 2, 2018 search warrant authorizing the installation of a mobile tracking device on a 2006 Jeep Commander sport utility vehicle [Gov't Ex. 4 ("Ex. 4")]; (3) a September 14, 2018 search warrant for Mr. Stachowiak's cellular phones that were seized when he was arrested [Gov't Ex. 5 ("Ex. 5")]; and (4) an October 3, 2018 search warrant for the data on those two phones [Gov't Ex. 6 ("Ex. 6")]. Mr. Stachowiak does not raise any challenge to the May 1, 2018 warrant for the search of the storage unit or the May 2, 2018 warrant for the installation of a mobile tracking device on the Jeep. However, his motion does seek suppression of evidence obtained during the September 14, 2018 traffic stop as fruit of the poisonous tree, bringing the seizure and subsequent searches of the cell phones obtained during the traffic stop within the scope of his suppression motion.

the application requests the following: "Provide a 'Locator Tool which uses Precision Location and GPS, based on Probable Cause.'" [Ex. 1 at 1.] Officer Johnson sought this information for a period of 60 days after the Order was issued. [Ex. 1 at 1.]

In his affidavit supporting the application, Officer Johnson stated that he was investigating Thomas Stachowiak "for selling methamphetamine in the Twin Cities Metropolitan area." [Ex. 1 at 2.] He certified that Mr. Stachowiak was using a cell phone with a number ending in 3856 in connection with the sale of methamphetamine and that "information likely to be obtained from a pen register, trap and trance, and electronic tracking device is relevant to the ongoing criminal investigation." [*Id.* at 2.]

Officer Johnson then indicated that he "relie[d] upon the following additional facts and circumstances for probable cause in applying for this Order...." [Ex. 1 at 3.] He indicated that he received information from a confidential reliable informant ("CRI") in February of 2018. [*Id.* at 3.] The CRI told Officer Johnson that a man named "Tommy (last name starting with an S) was a multi-pound methamphetamine dealer in the St. Paul Metro area." [*Id.* at 3.] The CRI linked the target to several addresses on the east side of St. Paul, but said that Tommy S. lived in a house near Stillwater, MN. [*Id.* at 3.] Officer Johnson set up surveillance at one of the addresses in east St. Paul and "located a vehicle that [was] listed to a female" with a Forest Street address in St. Paul. [*Id.* at 3.] Officer Johnson recalled that in a previous investigation in 2017, a confidential informant said that Thomas Stachowiak was trafficking narcotics and that he had once stayed at the Forest Street address. [*Id.* at 3.] Officer Johnson sent an unmarked 2016 photograph of Mr. Stachowiak to the CRI, who confirmed that the photo was of Tommy S. that the CRI previously identified as selling methamphetamine in St. Paul. [Ex. 1 at 3.]

Officer Johnson ran a criminal-history check on Mr. Stachowiak, turning up two felony drug convictions from 2001 and 2017. [Ex. 1 at 3.] Near the end of February 2018, he spoke with a different confidential informant who also identified Mr. Stachowiak from an unmarked 2016 photograph. [Ex. 1 at 3–4.] This informant indicated that Mr. Stachowiak "was a multi-pound methamphetamine dealer and stated that he "stayed in Stillwater, MN." [Ex. 1 at 4.] Sergeant Mike Meyer of the St. Paul Police Department's Narcotics Unit told Officer Johnson that Mr. Stachowiak was "a known narcotics dealer in the St. Paul area" and provided the 3856 cell phone number

as one that Sgt. Meyer had "obtained from a breach of trust report taken in St. Paul" related to Mr. Stachowiak. [Ex. 1 at 4.] The 3856 number linked to Mr. Stachowiak's public Facebook profile, but no subscriber information was available for the number when Officer Johnson ran it through police databases. [Ex. 1 at 4.] Officer Johnson noted that this was consistent with "a tactic often utilized by narcotic traffickers as a means to avoid detection from law enforcement." [Ex. 1 at 4.]

Within the three days prior to Officer Johnson's phone tracking application, he spoke with the first CRI who stated that Mr. Stachowiak had recently rented a vehicle and traveled to Las Vegas to pick up a large quantity of methamphetamine to transport back to St. Paul. [Ex. 1 at 4.] The CRI stated that the vehicle had been rented from Alamo Car Rental. [Ex. 1 at 4.] Officer Johnson corroborated that Mr. Stachowiak had rented a vehicle "from the Alamo Car Rental in Blaine MN, on a day to day rental...." [Ex. 1 at 4.] Mr. Stachowiak provided the 3856 phone number to Alamo for the vehicle rental. [Ex. 1 at 4.]

Based on this information, Officer Johnson stated that he believed that the 3856 phone number was "being used as a means to communicate in an effort to traffic large amounts of narcotics." [Ex. 1 at 4.] On March 7, 2018, a Ramsey County District Court Judge[3] signed the application and the requested Order. [Ex. 1 at 6, 9.] In the Order, the issuing judge found:

> on the basis of the information submitted by [Officer Johnson] that there is probable cause to believe that the information likely to be obtained by [installation of a pen register, trap and trace device, and electronic tracking device] is relevant to an ongoing criminal investigation and possible violation(s) by Thomas Danie Stachowiak ... for facilitating the distribution of methamphetamine in the Twin Cities metropolitan area.

[Ex. 1 at 7.] The Order authorized the installation of these investigative tools on the cell phone with the number ending in 3856 for a period of 60 days. [*Id.*]

---

[3]    The name of the issuing judge is not easily discernible from the signature blocks in Government's Exhibit 1.

*April 18, 2018 Tracking Order*

Officer Johnson applied for a similar Order authorizing the installation of a pen register, trap and trace device, and electronic tracking device on another cellular phone on April 18, 2018. [Ex. 2.] This application concerned a phone number ending in 1231, and it too asked that the Order "[p]rovide a 'Locator Tool which uses Precision Location and GPS, based on Probable Cause.'" [Ex. 2 at 1.] Like the March 7th Application, Officer Johnson indicated that the "facts and circumstances" described in his affidavit were being relied upon for a showing of "probable cause." [Ex. 2 at 3.]

Officer Johnson's April 18th application for the 1231 number includes much of the same information presented in the March 7th application. For example, Officer Johnson repeats the CRI's information regarding a man named Tommy S., and explains how the CRI identified this individual as Mr. Stachowiak from an unmarked photograph. [Ex. 2 at 3.] Officer Johnson also repeated information about checking Mr. Stachowiak's criminal history and his recollection of Mr. Stachowiak's relationship to a previous narcotics investigation that corroborated details of the information obtained from the CRI. [Ex. 2 at 3.]

The application further states that Officer Johnson spoke to a confidential informant at the end of February 2018. [Ex. 2 at 3–4.] Officer Johnson identifies the confidential informant as "CI #1" and states this individual was shown an unmarked 2016 photograph of Mr. Stachowiak, identified him, and stated that he was a multi-pound methamphetamine dealer. [Ex. 2 at 3–4.] "CI #1 also said that Stachowiak stayed in Stillwater MN and utilized the phone number [ending in]1231." [Ex. 2 at 4.] Following up on this information, Officer Johnson spoke with the original CRI, who said that Mr. Stachowiak was then using the phone number ending in 1231 to conduct his narcotics business. [Ex. 2 at 4.] This phone number was listed to "Tomm Johnson" in police databases. [Ex. 2 at 4.] Officer Johnson stated that based on his training and experience, "it is common for narcotic traffickers to utilize a fictitious name in an effort to avoid detection from law enforcement." [Ex. 2 at 4.] The CRI also told Officer Johnson that Mr. Stachowiak had been using a "'Latin King' drug connection to obtain his methamphetamine." [Ex. 2 at 4.]

Officer Johnson spoke to Officer S. Longen of the St. Paul Police Department's Narcotics Unit in the middle of April 2018. [Ex. 2 at 4.] Officer Longen told Officer Johnson that he spoke with a confidential informant ("CI #2") who knew Mr. Stachowiak and knew he used the number ending in 1231. [Ex. 2 at 4.] CI #2 also said that Mr. Stachowiak was a "high level methamphetamine dealer" and that Mr. Stachowiak used a Latin King drug connection to obtain methamphetamine. [Ex. 2 at 4.] This same informant identified Mr. Stachowiak from a photograph. [Ex. 2 at 4.]

Based on the information in Officer Johnson's second application, Ramsey County District Judge Richard Kyle signed the application and the Order for the 1231 phone on April 18, 2018. [Ex. 2 at 6, 9.] In the April 18th Order, Judge Kyle found:

> that there is probable cause to believe that the information likely to be obtained by [installation of a pen register, trap and trace device, and electronic tracking device] is relevant to an ongoing criminal investigation and possible violation(s) by Thomas Danie Stachowiak ... for facilitating the distribution of methamphetamine in the Twin Cities metropolitan area

[Ex. 2 at 7.] The April 18th Order also authorized the installation of these investigative tools for a period of 60 days. [Ex. 2 at 7.]

### September 14, 2018 Traffic Stop

On September 14, 2018, Deputy Adam Johnson was on patrol in Sauk Centre, Minnesota. [Tr. of Jan. 31, 2019 Hr'g ("Tr.") 14:9–10, ECF No. 64.] Deputy Johnson is a K–9 officer, and with him that day was his canine partner, Jax. [Tr. 13:12–25, 14:24–25.] Deputy Johnson was in a marked Sheriff's Department vehicle and he was in uniform. [Tr. 15:7–17.] While on patrol just after midnight, he saw a black Dodge pickup truck parked near the front door at a Holiday gas station. [Tr. 15:19–16:4, 16:21–23.] Deputy Johnson ran the plate number of the Dodge pickup and the registered owner's status came back as "revoked," meaning that the registered owner's license was not valid. [Tr. 16:5–20.] Deputy Johnson could see that the driver of the vehicle was a male, and he waited nearby to see if the driver would drive the vehicle out of the Holiday lot. [Tr. 17:1–9.]

Deputy Johnson saw the Dodge pickup pull out of the Holiday parking lot and decided to make a traffic stop. [Tr. 17:10–22.] He wanted to determine whether the

man he saw driving the vehicle was the registered owner whose license was revoked. [Tr. 17:10–22.] Deputy Johnson made a U–turn in his squad vehicle, pulled onto the road, and approached an intersection as the Dodge pickup crossed in front of him. [Tr. 46:6–12; *See* Ex. 7.[4]] He pulled up behind the Dodge, activated the emergency lights, and stopped behind the pickup when it pulled over near the intersection of Highway 71 and Interstate 94. Aside from his suspicions about he driver being unlicensed, the Deputy did not observe any traffic violations. [*See* Ex. 7; Tr. 46:25– 47:5.] Deputy Johnson approached the driver's side of the vehicle, identified the driver as Mr. Stachowiak, and asked him if he knew why he was being stopped. [*See* Ex. 7 at 1:25–1:30; Tr. 18:4–20:1.] There was a female passenger in the Dodge with Mr. Stachowiak. [Tr. 19:2–3.] Mr. Stachowiak stated that he thought he had taken care of his license issue and believed his license would not go into a revoked status until October 1, 2018. [Tr. 20:2–3; Ex. 7 at 1:30–1:40.]

Deputy Johnson testified that Mr. Stachowiak was "very fidgety, manic," and was reaching around the vehicle very quickly, talking fast, and sweating when they were talking. [Tr. 20:4–8.] Based on these observations and his own training and experience as an officer, Deputy Johnson believed that Mr. Stachowiak was under the influence of methamphetamine. [Tr. 21:6–23:6.] Deputy Johnson asked Mr. Stachowiak to step out of the vehicle and asked dispatch to send another car to the scene. [Ex. 7 at 6:10–6:20, 6:40–6:45.] Mr. Stachowiak's hands were in his pockets and clenched when he got out of the vehicle and he was nervous. [Tr. 23:19–24; Ex. 7 at 6:45–7:20.] When Deputy Johnson asked Mr. Stachowiak "Dude, what're you on right now?" he denied being under the influence. [Ex. 7 at 6:55–7:01.] Deputy Johnson brought Mr. Stachowiak back to the front of his squad car. He asked Mr. Stachowiak to open his mouth so he could see his tongue. [Ex. 7 at 7:35–7:40; Tr. 24:12–14.] Deputy Johnson observed that there were "heat bumps" on Mr. Stachowiak's tongue, which is consistent with signs that a person has smoked methamphetamine from a pipe. [Tr. 24:15–21.] Deputy Johnson then asked Mr. Stachowiak "When was the last time you used methamphetamine?" to which he responded "Probably three weeks ago." [Ex. 7 at 7:40–7:45.] Deputy Johnson asked

---

[4]    Government's Exhibit 7 is a thumb drive that contains squad car video and audio from the traffic stop.

if there was anything illegal in the vehicle and Mr. Stachowiak told him there was not. [Ex. 7 at 7:50–8:05.]

Deputy Johnson then approached the passenger side of the vehicle and asked the female passenger whether there was anything illegal in the vehicle. [Ex. 7 at 9:00–9:10.] He asked her if she uses methamphetamine, which she denied, but she volunteered that she smokes pot. At that point, Deputy Johnson indicated that he saw marijuana "shake"[5] in the vehicle. [Ex. 7 at 10:00–10:14; Tr. 25:23–26:6.] Deputy Johnson came back to the front of his squad car and told Mr. Stachowiak that he had seen marijuana stems and other debris in the interior of the car and told him "obviously you're tweakin' balls right now"; Mr. Stachowiak again denied being under the influence of any substances. [Ex. 7 at 10:48–10:59.]

Deputy Johnson next led his canine partner Jax around the vehicle to sniff for the presence of drugs. [Ex. 7 at 12:45–13:20.] As Deputy Johnson got Jax out of the vehicle, Mr. Stachowiak stated that there was marijuana under the seat. [Tr. 30:10–13.] Jax alerted under the driver's seat when Deputy Johnson ran him around the Dodge pickup, giving an indication that there were drugs in the cab of the pickup. [Tr. 30:14–25.] Deputy Johnson and another officer who arrived on the scene then searched the interior of the vehicle. [Ex. 7 at 13:30–33:00.] The officers found a bag of suspected marijuana under the driver's seat, a pipe coated in white residue that appeared to be methamphetamine, and a large baggie of a crystal-like substance that field-tested positive for methamphetamine. [Tr. 31:1–33:6.] Deputy Johnson and other officers then placed Mr. Stachowiak under arrest, which involved a brief struggle. [Ex. 7 at 33:00–35:00; Tr. 33:10–36:11.] Deputy Johnson searched Mr. Stachowiak incident to the arrest based on Strearns County Sheriff's Department policy and found another baggie with a crystal-like substance in it that also field-tested positive for methamphetamine. [Tr. 36:12–37:5.]

Two cellular phones were seized from Mr. Stachowiak's and entered into property at the Stearns County Jail with Mr. Stachowiak's other belongings. [Ex. 5 at

---

[5]    Deputy Johnson testified that "shake" is a street term for "marijuana remnants ... like stems and leaves." [Tr. 26:3–4.]

2.] Based on the evidence obtained as a result of the traffic stop, St. Paul Police Officer Clay Johnson applied for and obtained a warrant to get possession of any of Mr. Stachowiak's cell phones at the Stearns County Jail [Ex. 5], and subsequently applied for a warrant to search the phones' contents [Ex. 6].

## Discussion

## I.    Cell Phone Tracking Warrants

Mr. Stachowiak asks the Court to suppress information obtained pursuant to the cell-phone tracking Orders obtained by Officer Johnson on March 7, 2018 and April 18, 2018. [Def.'s Mem. at 6–16.] Relying on the Supreme Court's decision in *United States v. Carpenter*, 138 S. Ct. 2206 (2018), he argues that to obtain the electronic tracking information authorized by both Orders, Officer Johnson was required to apply for a warrant supported by probable cause, and the March 7th and April 18th Orders fail to satisfy that requirement. [*See* Def.'s Mem. at 2, 4.] For the reasons that follow, the Court concludes that the motion to suppress should be denied.

### A.  Legal Standard

The purpose of the Fourth Amendment "'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" *Carpenter*, 138 S. Ct. at 2213. To achieve that purpose, the amendment protects against "unreasonable searches and seizures" and requires that warrants be issued only upon a showing of "probable cause." U.S. Const., amend. IV. When a government official applies for a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

When it comes to tracking an individual's movements by investigating the location of his or her cellular phone, the Supreme Court recently settled several questions. In *Carpenter*, the Supreme Court held that: (1) a person has a legitimate expectation of privacy in a historical record of his or her physical movements as captured by cell-site location information ("CSLI"); (2) when law enforcement officers obtain historical CSLI from a wireless carrier, that action constitutes a Fourth

Amendment search; and (3) the government must generally obtain a search warrant based on probable cause before it can acquire historical CSLI. 138 S. Ct. 2206.

### B.  Probable Cause

Both applications for the tracking orders in this case reference 18 U.S.C. § 3122, a provision in the Stored Communications Act ("SCA"), which authorizes a government attorney to apply for an order authorizing or approving the installation of a pen register or a trap and trace device based only on "a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by [a law enforcement agency]." 18 U.S.C. § 3122(b)(2). Prior to the *Carpenter* decision, this statute authorized an order to be issued on a showing that "falls well short of the probable cause required for a warrant." *Carpenter*, 138 S. Ct. at 2221. The applications in this case also reference a Minnesota law that allows a law enforcement officer to apply for an order authorizing the use of a pen register, trap and trace device, or "mobile tracking device" based on "a statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that an order should be issued." Minn. Stat. § 626A.36, subd. 2(2). However, Officer Johnson's applications did not merely seek the installation of a pen register and trap and trace device; they also asked the issuing judges to allow law enforcement to obtain real-time GPS tracking data of the phones' location as well as the content of voicemails, text messages, images, etc. [Ex. 1 at 1; Ex. 2 at 1.]

Assuming that *Carpenter*'s conclusions regarding historical CSLI apply with equal force to law enforcement requests for real-time GPS tracking information,[6] compliance with *Carpenter*'s holding would require law enforcement to obtain a search warrant

---

[6]  *Carpenter* itself declined to discuss any views on "real-time CSLI...." 138 S. Ct. at 2220. However, the same concerns that motivated the majority's conclusion in *Carpenter* regarding historical CSLI, including the intrusion on personal privacy occasioned by the ability of law enforcement to use cell-phone location data to compile comprehensive information about an individual's past movements, *see* 138 S. Ct. at 2217-19, apply with equal force to real-time GPS monitoring of a cell-phone's location.

supported by probable cause to lawfully track Mr. Stachowiak's phone. The form Officer Johnson used to apply for the March 7th and April 18th tracking Orders did not use the words "search warrant,"[7] and its reference to statutes authorizing investigative tools that do not require a showing of probable cause raises concern. However, on this record, there are several indications that Officer Johnson and the issuing judges had the understanding that the applications set forth probable cause to believe that evidence of Mr. Stachowiak's suspected methamphetamine trafficking would be revealed through the tracking tool that was requested. In both applications and in the accompanying affidavits, Officer Johnson indicated that he was seeking authorization for the installation of a precise location tool on the corresponding cell-phones "based on Probable Cause." [Ex. 1 at 1; Ex. 2 at 1.] Officer Johnson also stated that he "relie[d] upon the ... additional facts and circumstances [set forth in his affidavits] for probable cause in applying for this Order." [Ex. 1 at 3; Ex. 2 at 3.] Finally, the issuing judges indicated that "on the basis of the information submitted by the applicant, there is probable cause to believe that the information likely to be obtained by such installations and use is relevant to an ongoing criminal investigation into possible violation(s) by Thomas Daniel Stachowiak ... for facilitating the distribution of methamphetamine...." [Ex. 1 at 7; Ex. 2 at 7.]

Despite these references to probable cause, Mr. Stachowiak argues that the tracking orders in this case fail to comply with the Fourth Amendment's requirements. He contends that a tracking warrant can be issued:

> only upon a showing of "probable cause the person who possesses an electronic device is committing, has committed, or is about to commit a crime." ... But the application and orders at issue here do not purport to make out that specific form of probable cause. Instead, these documents

---

[7]    "For Fourth Amendment and exclusionary rule purposes, it does not matter that the document is not specifically denominated as a 'search warrant'...." *United States v. Temple*, No. S1-4:15-CR-230-1 JAR(JMB), 2017 WL 7798109, at *30 (E.D. Mo. Oct. 6, 2017), *report and recommendation adopted*, No. 4:15-CR-230-JAR-L, 2018 WL 1116007 (E.D. Mo. Feb. 27, 2018) (assuming that the use of a cell-site simulator for real-time tracking of the defendant's cell phone was a Fourth Amendment search and finding no Fourth Amendment violation, in part, because the court order was supported by a sworn affidavit that established probable cause).

frame "probable cause" in terms of a belief that a requested pen register, trap-trace, and electronic tracking will be "relevant to an ongoing criminal investigation."

[Def.'s Reply at 5; *see also* Def.'s Mem. at 12.] Although the tracking orders in this case articulate the issuing judges' probable-cause findings imperfectly, for several reasons, the Court concludes that both tracking orders satisfy the essential requirement of *Carpenter*.

First, even if the probable-cause findings made by the issuing are expressed slightly differently than one might expect, the language in the tracking orders expresses the essence of the finding required by the Fourth Amendment. A judge asked to issue a warrant would be required to find, based on the facts presented by the applicant, that there is a fair probability that evidence of Mr. Stachowiak's suspected methamphetamine dealing would be found in data generated by the real-time tracking of his cellular phone. *See Gates*, 462 U.S. at 238 ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place."). Here, the tracking orders state that based on the information provided by Officer Johnson's affidavits, the issuing judges found probable cause to believe that evidence relevant to an ongoing criminal investigation of Mr. Stachowiak's suspected distribution of methamphetamine would be generated by, among other things, installation of a real-time geo-locating tool. Even had Officer Johnson presented an application for a search warrant, it is difficult to see how the issuing judges' probable-cause findings would have been materially different than the findings made in the tracking orders.

The Court notes that in Mr. Stachowiak's articulation of the traditional probable cause showing excerpted above is itself incorrect. An affiant need not show that a person "has committed or is about to commit a crime," though the Court believes that showing is readily met in this case. Instead an affiant must present probable cause that evidence of a crime will be found in a place to be searched. *Gates*, 462 U.S. at 238 ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place."). *That* showing is virtually indistinguishable in a practical sense from

the articulation set forth in the admittedly imperfect form used in this case. It is difficult indeed to discern a difference in the tracking context between evidence of a crime being located in the place to be search (the geolocation data) and such evidence being "relevant to an investigation" into the drug-dealing activities of Mr. Stachowiak, which was the language used in the form.

Second, Officer Johnson's applications differ significantly from the type of Stored Communications Act ("SCA") applications found to be insufficient in *Carpenter* for law enforcement to obtain historical CSLI. [*See* Def.'s Mem. at 7 (arguing that believing that records are relevant and material to an ongoing investigation falls short of the probable cause required for a warrant and citing *Carpenter*, 138 S. Ct. at 2221).] In *Carpenter*, the Court indicated that acquisition of cell-site records under the 18 U.S.C. § 2703(d) involves a showing only that there are "reasonable grounds for believing that the records were relevant and material to an ongoing investigation ... [, which] falls far short of the probable cause required for a warrant." 138 S. Ct. at 2221 (citing 18 U.S.C. § 2703(d)) (internal quotations and citation omitted). But applications for such SCA orders are not generally accompanied by the sworn affidavit of a law enforcement officer that resembles the one Officer Johnson provided here. Instead, the SCA only requires certification of the applicant (usually an Assistant United States Attorney) that the information sought is relevant and material to an ongoing investigation. The showing Officer Johnson made in support of each tracking order was far greater. This indicates that although Officer Johnson used a form referencing provisions of the SCA and state law that do not require a showing of probable cause, he made a far more robust showing than those provisions required. Indeed, the applications themselves link the real-time tracking tool to probable cause, Officer Johnson indicated that his affidavits set forth probable cause, and the issuing judges both discussed their findings in terms of probable cause. And unlike the SCA applications at issue in *Carpenter*, he swore to the truthfulness of the detailed factual recitation found in the application. This strongly suggests that Officer Johnson was attempting to satisfy the warrant requirement with his applications rather than the bare-bones requirements of the SCA, and that the issuing judges concluded his affidavits met the probable-cause showing for a warrant.

Finally, Officer Johnson's affidavits accompanying his applications set forth ample probable cause that Mr. Stachowiak was engaged in distribution offenses

involving methamphetamine and that tracking of his cellular phones would reveal evidence of criminal activity. Officer Johnson's affidavits for the March 7th and April 18th tracking orders both described significant information provided by CRIs and CIs, much of which was corroborated by Officer Johnson's own investigation, other officers, or other informants. Several sources identified Mr. Stachowiak from unmarked photographs. Officer Johnson was able to link Mr. Stachowiak to the cellular phone numbers at issue by various means. And Officer Johnson received information that indicating that the cellular phone numbers at issue were being used by Mr. Stachowiak to conduct his methamphetamine business. On this record, the Court easily concludes that there was probable cause supporting the issuing judges' decisions to allow law enforcement to obtain real-time tracking information for Mr. Stachowiak's phones for a period of 60 days in both the May 7th and April 18th tracking orders.

For these reasons, the Court finds that the tracking orders issued here are consistent with *Carpenter*. Accordingly, Mr. Stachowiak has failed to identify any violation of the Fourth Amendment's warrant requirement and his motion to suppress should be denied.

### C.  Exceptions to the Exclusionary Rule: *Davis* & *Leon*[8]

The government argues that even if the March 7th and April 18th tracking orders did violate the Fourth Amendment based on the rule announced in *Carpenter*, the suppression of the location information obtained pursuant to the tracking orders would not be appropriate. (*See* Gov't Mem. at 9–11.) In support of this argument, the government cites *Davis v. United States*, 564 U.S. 229 (2011), and *United States v. Leon*, 468 U.S. 897 (1984). With respect to *Davis*, the government asserts that "Officer Johnson reasonably relied on existing precedent," so that it would not serve the

---

[8]     In Part I.B. above, this Court has concluded that the tracking orders in this case did not violate Mr. Stachowiak's Fourth Amendment rights because they were supported by an adequate showing of probable cause and the issuing judges' probable-cause findings were sufficient. The Court recommends Mr. Stachowiak's motion to suppress be denied on that basis. The following discussion addresses the parties' arguments concerning whether suppression is required in the event the Court finds the orders to be inadequate under *Carpenter*. The application of the exclusionary rule should only become an issue if the District Court disagrees with this Court's conclusion in Part I.B.

purposes of the exclusionary rule to suppress evidence obtained pursuant to the tracking orders even if they violated Mr. Stachowiak's Fourth Amendment rights. [Gov't Mem. at 10–11.] As for *Leon*, the government argues that exclusion of the tracking evidence would be inappropriate because: Officer Johnson did not mislead the issuing judges; the issuing judges did not wholly abandon their judicial role; the affidavit supporting the orders was no so deficient that official belief in its existence was entirely unreasonable; and the warrant was not so facially deficient that no reasonable executing officer could presume it to be valid. [Gov't Mem. at 9.]

### Davis v. United States

In *Davis*, the Supreme Court addressed whether the exclusionary rule applies where police conduct a search "in compliance with binding precedent that is later overruled." 564 U.S. at 232. The Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* Officer Johnson applied for and obtained the tracking orders at issue in March and April of 2018. The Supreme Court did not decide *Carpenter* until June 22, 2018, several months after the applications at issue in this case. Because the *Carpenter* decision post-dates the allegedly unlawful search permitted by the two tracking orders in this case, if binding appellate precedent allowed law enforcement to obtain the tracking evidence that was gathered without a warrant, then the evidence could still be admitted notwithstanding the exclusionary rule pursuant to *Davis*. *See United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (applying the *Davis* exception to the exclusionary rule where Fourth Circuit precedent that pre-dated *Carpenter* and was in effect at the time of the search at issue held that the government could obtain historical CSLI without a warrant). If, on the other hand, Officer Johnson's conduct was not supported by such authority, then *Davis*'s exception to the exclusionary rule would not apply. *See, e.g., United States v. Burston*, 806 F.3d 1123, (8th Cir. 2015) (concluding that a warrantless search involving a drug-detection dog's sniff of a residence from within the curtilage violated the defendant's Fourth Amendment rights under *Florida v. Jardines*, 569 U.S. 1 (2013), and the good-faith exception in *Davis* did not apply because neither *United States v. Scott*, 610 F.3d 1009 (8th Cir. 2010), nor *United States v. Brooks*, 645 F.3d 971 (8th Cir. 2011), permitted the

use of a drug-detection dog within the curtilage of a home at the time the warrantless search was conducted).

Here, the government points to no binding appellate decision (either from the Supreme Court or the Eighth Circuit) that existed at the time Officer Johnson applied for the tracking orders that permitted law enforcement to obtain real-time CSLI without obtaining a warrant supported by probable cause.[9] In fact, the government does not point to authority from either court that held that historical CSLI could be secured without a warrant. Because the government has failed to develop this argument, it would be improper to deny Mr. Stachowiak's motion to suppress on this basis.

### United States v. Leon

In *Leon*, the Supreme Court held that when officers rely in good faith on a search warrant issued by a neutral and detached magistrate, evidence obtained pursuant to that warrant need not be excluded even if a court later determines that the search warrant was invalid. 468 U.S. at 923. The Court noted that the purpose of the exclusionary rule is "to deter police misconduct rather than to punish the errors of judges and magistrates," and such a purpose is not served by excluding evidence after an officer obtains a warrant in good faith. *Id.* at 916. The Court further concluded "that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918.

Nevertheless, *Leon*'s good-faith doctrine does not apply, and the exclusionary rule will bar the introduction of evidence obtained pursuant to a defective search warrant, in any of the following four circumstances: (1) the issuing judge "wholly abandoned[her] judicial role;" (2) the application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" (3) the issuing

---

[9]     The Court has located a non-binding appellate decision that pre-dates *Carpenter* holding that a warrant is not required for law enforcement to track a suspect's cellular phone in real time because a person has no reasonable expectation of privacy in the location data transmitted from the phone. *See, e.g., United States v. Skinner*, 690 F.3d 772, 777–81 (6th Cir. 2012) (relying on *United States v. Knotts*, 460 U.S. 276 (1983), and distinguishing *United States v. Jones*, 565 U.S. 400 (2012)).

judge was misled by information that the officer applying for the warrant "knew was false or would have known was false except for his reckless disregard of the truth;" or (4) the warrant was "facially deficient." 468 U.S. at 923. Essentially, when one of these exceptions is shown, law enforcement cannot be said to have relied on the warrant in good faith.

The government argues that Officer Johnson relied on the tracking orders in this case in good faith and none of the four *Leon* exceptions is present in this case. [*See* Gov't Mem. at 9], and the Court agrees. Mr. Stachowiak has not made a *Franks*[10] challenge, and there is no suggestion that Officer Johnson made any misrepresentations in his affidavits that misled the issuing judges. There is no indication that the issuing judges abandoned their judicial roles. Moreover, consistent with the Court's determination above regarding the probable cause set forth in Officer Johnson's applications, the Court finds that neither application was so lacking in probable cause that it would have been entirely unreasonable for an officer executing the tracking orders to believe probable cause existed. Mr. Stachowiak does not argue that the tracking orders were facially deficient.[11]

Mr. Stachowiak argues that *Leon* should not prevent application of the exclusionary rule to the evidence obtained pursuant to the tracking orders because Officer Johnson's application referenced Minn. Stat. §§ 626A.36, and 626A.37, which apply to "mobile tracking devices," like a GPS tracker that would be physically placed on a vehicle. [*See* Def.'s Reply at 6–7.] He contends that based on *United States v. Jones*, 565 U.S. 400 (2012), and *State v. Liebl*, 886 N.W.2d 512 (Minn. Ct. App. 2016), Officer Johnson could not have reasonably believed that the tracking orders were

---

[10]   *Franks v. Delaware*, 438 U.S. 153 (1978); *United States v. Puckett*, 466 U.S. 626, 630 (8th Cir. 2006) (equating the *Leon* exception regarding misleading false statements to the issuing judge with a *Franks* violation).

[11]   To the extent Mr. Stachowiak's arguments in his memoranda suggest that the tracking orders were deficient because they were not called "search warrants," the Court concludes that should not defeat application of the *Leon* good-faith exception to the exclusionary rule. What matters is not what the applications and the judicial orders were called; instead, it is most important that they were supported by a showing of probable cause and the issuing judges made the necessary probable-cause findings.

compliant with the Fourth Amendment. [Def.'s Reply at 7.] In *Liebl*, the Minnesota Court of Appeals held that the United States Supreme Court's decision in *Jones* foreclosed any claim that law enforcement could reasonably have believed, nearly three years after *Jones* was decided, that it was permissible to place a GPS tracking device on a vehicle without first obtaining a probable-cause determination from a judge. *Liebl*, 886 N.W.2d at 520. Unlike the tracking orders in *Jones* or *Liebl*, the March 7th and April 18th tracking orders in this case did not authorize the physical placement of any mobile tracking device on a vehicle, and none were used in the investigation. It is therefore unclear what, if any, significance these decisions have to the validity of the tracking orders in this case.

Finally, the Court concludes that *Leon*'s good-faith doctrine applies in this case because suppression of the evidence obtained pursuant to the tracking orders would not serve the deterrent purpose of the exclusionary rule. Officer Johnson's applications for the tracking orders were accompanied by affidavits that provided a strong showing of probable cause. Each application suggests that Officer Johnson intended to provide a probable-cause showing to justify tracking of Mr. Stachowiak's cell phones. And the tracking orders reflect the issuing judges' findings that probable cause supported the real-time tracking of the phones. The problems that Mr. Stachowiak identifies throughout his briefing (e.g., citations to inapplicable provisions of Minnesota law; sections of the SCA that do not require a showing of probable cause; disagreements with the adequacy of the showing made), are not the product of any police misconduct. At worst, Officer Johnson appears to have relied upon what is now an outdated and arguably sloppy form when he applied for the tracking orders in this case. Under these circumstances, suppression of the tracking evidence would not deter any police misconduct.

## II.   Traffic Stop

Mr. Stachowiak next argues that Deputy Johnson unlawfully stopped his vehicle on September 14, 2018. Specifically, he asserts that Deputy Johnson had neither a reasonable articulable suspicion nor probable cause to conduct the traffic stop, so the evidence obtained during the subsequent search of the vehicle must be suppressed along with any fruit of the poisonous tree. [Def.'s Mem. at 17–21.] Mr. Stachowiak contends that Deputy Johnson stopped the Dodge pickup based on nothing more than a

hunch that the person driving it might be the vehicle's registered owner, whose license was revoked. [Def.'s Mem. at 18.][12] The government argues that the traffic stop did not violate Mr. Stachowiak's Fourth Amendment rights because Deputy Johnson had a reasonable articulable suspicion that the registered owner of the Dodge pickup was operating the vehicle without a valid driver's license. [Gov't Mem. at 12–14.]

A traffic stop, even one that is for a limited purpose and lasts only briefly, is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). When an officer has reasonable articulable suspicion or probable cause to believe that a violation of traffic laws has occurred, a traffic stop is reasonable. *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014) (citing *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006)). More specifically, "[i]f there is an articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, a traffic stop on that basis is not unreasonable under the Fourth Amendment." *Id.* (quoting *Prouse*, 440 U.S. at 663). Reasonable articulable suspicion is a less demanding standard than probable cause and is considerably lower than a preponderance of the evidence, but "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

Based on the evidence in the record, Deputy Johnson's stop of the Dodge pickup on September 14, 2018 was supported by a reasonable articulable suspicion that a motorist without a valid license was driving the vehicle. The evidence shows that Deputy Johnson stopped the Dodge only after he ran the license plate and determined that the registered owner did not have a valid driver's license. Deputy Johnson was also able to confirm that the registered owner of the pickup was a male and that the individual he saw get into the driver's seat of the vehicle was a male. Under these

---

[12]    On April 1, 2019, the United States Supreme Court granted a petition for certiorari in *Kansas v. Glover*, No. 18–556, 2019 WL 1428943 (Apr. 1, 2019). In the decision below, the Supreme Court of Kansas held that an officer did not have a reasonable articulable suspicion to conduct an investigative stop of a motor vehicle based only on the assumption that the person driving was the car's registered owner, whose driver's license had been revoked. *State v. Glover*, 422 P.3d 64, 66 (Kan. 2018).

circumstances, the Court concludes that the traffic stop did not violate the Fourth Amendment.

Mr. Stachowiak argues that these circumstances do not support a finding that the traffic stop was supported by reasonable articulable suspicion because Deputy Johnson did not compare the driver's age, race, height, or weight to the information available concerning the registered owner of the vehicle prior to the initiating the stop. However, under existing Eighth Circuit law, confirmation of such details is not required for there to be reasonable articulable suspicion justifying a brief investigatory stop. *See Chartier*, 772 F.3d at 543 (finding reasonable articulable suspicion for an initial traffic stop where a license plate check revealed the registered owner was revoked and rejecting the defendant's argument that the officer should have done more to confirm at least the sex of the driver operating the vehicle prior to initiating the stop); *see also Hoff v. Edwards*, No. 13-cv-1992 (JRT/LIB), 2014 WL 1775737, at *5 (D. Minn. May 5, 2014) (noting that "[c]ourts applying *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] have found that an officer's belief that a driver is not properly licensed provides reasonable suspicion to effect a traffic stop *even when the officer is mistaken about who is driving the vehicle*" and that officers may presume that the person driving a vehicle is the registered owner) (emphasis in original). Mr. Stachowiak's argument to the contrary does not carry the day.

For these reasons, the Court recommends that Mr. Stachowiak's motion to suppress evidence obtained subsequent to the traffic stop be denied.[13]

Recommendation

Based on the foregoing, **IT IS HEREBY RECOMMENDED THAT** Mr. Stachowiak's Motion to Suppress Search and Seizure **[ECF No. 51]** be **DENIED**.

---

[13]    Mr. Stachowiak argues only that the evidence found after the initial stop of his vehicle is fruit of the poisonous tree, not that independent, subsequent violations of his Fourth Amendment rights would otherwise justify suppression. Because the Court has found that the initial stop was valid, the Court further concludes that the evidence seized following the stop is not fruit of a poisonous tree.

Date: April 23, 2019                              *s/Katherine Menendez*
                                                  Katherine Menendez
                                                  United States Magistrate Judge

NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.